[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 28, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-16598
Non-Argument Calendar
_____

D. C. Docket No. 05-00076-CV-DHB-1

CHERYL M. REEVES,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(June 28, 2007)**

Before WILSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Cheryl M. Reeves appeals the district court's affirmance of the Social Security Administration's ("SSA") denial of supplemental security income ("SSI") payments, 42 U.S.C. § 1383(c)(3), and disability insurance benefits ("DIB"), 42 U.S.C. § 405(g). On appeal, Reeves argues that the SSA's determination, acting through an administrative law judge ("ALJ"), that Reeves was not disabled was not supported by substantial evidence because the ALJ did not: (1) evaluate properly and give due weight to the medical evidence of record; and (2) consider her subjective complaints of pain and fatigue. We disagree with Reeves and find no error in the district court's affirmance of the SSA's determination. Thus, we affirm.

## I. Background

Reeves filed an application for SSI and DIB on October 3 and 23, 2002, respectively, alleging a disabling condition commencing on July 19, 2002. The SSA denied her application initially and on reconsideration. Reeves requested and was granted a hearing by an ALJ.

### (A) Administrative Hearing

At the time of the hearing, Reeves was a 57-year-old high school graduate who had worked in the laundry room of a hotel from 1990 until 2002. Reeves testified that her job required her to collect laundry, move it throughout the

building in a push-cart, and sort, wash, dry, and fold the laundry. She had to lift and carry approximately 20 pounds during her job, and she remained in a hot laundry room for six hours per day with few opportunities to sit down. With regard to her daily activities, Reeves stated that she had not driven a car since 2002, but that she swept the kitchen, put the clothes in the washing machine, and loaded the dishwasher. When she did those activities, she had to lie down for 30 minutes after to regain her strength. If she cooked, she had to have a chair next to her so that she could sit down. She also attended church twice per month and went to the grocery store once or twice per month, but only with a companion. Reeves indicated that she was unable to exercise, but that she listened to the radio, read, and watched television.

As to the physical problems that prevented Reeves from working, she testified that she had no strength, had to lay down and rest several times per day, and had a very low energy level. She also experienced pain all over her body every day and she was unable to stand for long periods of time. She had balance problems and she could not sleep without the aid of a sleeping pill. She had to lay down for 30 minutes at least 5 or 6 times per day. She experienced tremors, primarily in her legs and hands, that began when she was diagnosed with thyroid problems in 2002, but none of her doctors had ever given her a reason for her

tremors or specifically associated the tremors with the thyroid issues. She also had trouble controlling her bladder.

The ALJ stated that Reeves's residual functional capacity ("RFC") included the following limitations: (1) limited to medium or light work; (2) could climb occasionally, but never on a rope, ladder, or scaffold; (3) had to wear corrective lenses for vision; (4) could not work around hazards such as dangerous machinery; and (5) was best suited for simple work without prolonged interpersonal contact. The Vocational Expert ("VE") testified that a person with such a RFC could perform work as a laundry laborer.

**(B) Relevant Medical Evidence**

From May 6 through October 31, 2002, Reeves sought treatment from Thompson Community Mental Health under Drs. Hany Elia and Kenneth Azar. On her first visit to Dr. Elia, Reeves was diagnosed with panic attacks, depressive disorder, and arthritis, and was prescribed Zoloft and Klonopin. In May 2002, Dr. Elia diagnosed Reeves with panic attacks, depressive disorder, arthritis, hypothyroidism, and essential tremors. Dr. Elia observed that Reeves had "fine tremors in her upper extremities." On a subsequent visit to Dr. Elia, Reeves reported that, if she did not take her Klonopin, she developed tremors. On August 8, 2002, Reeves complained to Dr. Elia of gait instability, muscle aches, fatigue,

and jerking movements in her arms. Dr. Elia noted that Reeves had seen her primary care physician, Dr. Susan Land, regarding those issues and that, after completing various tests, Dr. Land recommended that Reeves return to work. Dr. Elia further noted that, during the examination, Reeves's gait was slow and unsteady, she had difficulty sitting and standing, and she had lost 20 pounds. In October 2002, Dr. Azar found that Reeves's gait had improved, but that she still suffered from sleeplessness, fatigue, mood disorder secondary to medical illness, panic attacks, myoclonus, and hypothyroidism. In February 2003, Dr. Azar completed a mental impairment questionnaire on Reeves's behalf. Dr. Azar diagnosed Reeves with mood disorder secondary to her medical illness. He further concluded that Reeves "was a hard worker. However, she could not continue after she started experiencing debilitating physical symptoms which caused her depression."

Reeves was treated at the Medical College of Georgia from 2001 through 2003. In July 2002, an x-ray of Reeves's head revealed that she had mild atrophy for her age and no acute process. In December 2002, Dr. Loebl, a rheumatologist, examined Reeves due to her complaints of weakness, depression, and pain. Dr. Loebl noted that Reeves previously had been examined in neurology and had a

5

normal neurological examination with the exception of a positive Romberg sign[1].

In January 2003, Dr. Walter Moore, also a rheumatologist, examined Reeves and found that her musculoskeletal system was "[e]ssentially within normal limits, except for multiple tender trigger points, especially in the upper shoulder girdle and her arms." Dr. Moore further determined that Reeves exhibited an abnormal Romberg sign "where [she] essentially has the sensation of falling backwards." Dr. Moore noted that Reeves had been diagnosed with fibromyalgia, but that her abnormal Romberg sign did not fit the clinical diagnosis of fibromyalgia. Thus, Dr. Moore recommended that Reeves undergo a neurological examination. During an examination in April 2003, Dr. Moore noted that Reeves complained of pain and fatigue and appeared tearful and anxious. Dr. Moore found that Reeves had total body tenderness and "evidence of a resting tremor[2] which appear[ed] to be symmetrical and improve[d] with intention."

Several state agency non-examining physicians provided residual functional capacity assessments of Reeves in 2003. First, in February 2003, a psychiatrist

---

[1]A positive Romberg sign occurs when, "with feet approximated, the patient stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive." STEDMAN'S MEDICAL DICTIONARY 1619 (26th ed.) (1995).

[2]A "resting tremor" is defined as "a coarse, rhythmic [tremor] . . . usually confined to hands and forearms, that appears when the limbs are relaxed, and disappears with active limb movements." STEDMAN'S MEDICAL DICTIONARY 1844 (26th ed.) (1995).

6

reported on Reeves's <u>mental</u> functional capacity and indicated that she was moderately limited in the following areas: (1) her ability to maintain attention and concentration for extended periods; (2) her ability to maintain a normal work-day without an unreasonable number of interruptions due to her psychologically-based symptoms; (3) her ability to interact appropriately with the general public; and (4) her ability to set realistic goals and plans.  Next, a physician reviewed Reeves's <u>physical</u> functional capacity, finding that she could: (1) occasionally lift up to 50 pounds; (2) frequently lift up to 25 pounds; (3) stand or walk with normal breaks for approximately 6 hours in an 8-hour work-day; and (4) occasionally climb.  The physician concluded that Reeves should have had "no problems performing normal work [with] the restrictions outlined [above]."  In an additional <u>mental</u> functional capacity assessment, a psychiatrist made similar findings to those found in the February 2003 mental assessment.

In November 2003, Reeves underwent a neurologic evaluation by Dr. Joel Greenberg.  Dr. Greenberg observed that Reeves was anxious, depressed, and occasionally tearful, and had a tremor that worsened during the examination, a normal gait, and an absent Romberg's sign.  Dr. Greenberg determined that Reeves had: (1) a history of fibromyalgia; (2) anxiety and depression; and (3) no evidence of neurologic abnormality.  He noted that Reeves may have been "disabled by her

7

psychiatric symptoms" and that she may have had "a component of fatigue which [was] not apparent on neurologic evaluation." Based upon his medical examination, Dr. Greenberg found that Reeves had the following limitations concerning work-related activities: (1) Reeves could climb only occasionally or infrequently; and (2) her sight was limited.

In May 2004, after her administrative hearing, Reeves underwent a general medical consultative examination by Dr. Ismael Hernandez. Dr. Hernandez noted that Reeves appeared anxious, depressed, and tearful. He further observed that Reeves had "evidence of a resting tremor which appear[ed] to be symmetrical and improve[d] with intention." He also found that a Romberg sign was absent. Dr. Hernandez made the following conclusions regarding Reeves's health:

> This patient is disabled by her psychiatric symptoms. Psychiatric evaluation regarding disability may be very appropriate. Patient was diagnosed at the Medical College of Georgia of fibromyalgia with multiple trigger points and may have sleep disorders and fatigue. The psychiatric evaluation will determine if her "fibromyalgia symptoms" may be psychosomatic problems.

**(C) ALJ's Decision**

The ALJ first determined that Reeves had not engaged in substantial gainful activity since the onset date of her impairment. The ALJ next reviewed the medical evidence, specifically: (1) Dr. Azar's February 2003 mental impairment questionnaire, noting that Dr. Azar had not treated Reeves's physical ailments;

8

(2) Dr. Moore's April 2003 examination; (3) Dr. Greenberg's November 2003 neurological consultative examination; and (4) Dr. Hernandez's May 2004 consultative examination. With regard to Reeves's mental impairment, the ALJ determined that the evidence established that Reeves had the following limitations: (1) mild restriction of activities of daily living; (2) moderate difficulty in maintaining social functioning; (3) moderate deficiency in concentration; and (4) no repeated episodes of decompensation. As to Reeves's physical impairments, the ALJ found that, based upon the medical evidence, Reeves suffered from fibromyalgia, "although only by a questionable history," osteoarthritis, and depression. The ALJ concluded that those impairments were severe, but not severe enough to meet or medically equal a listed impairment.

The ALJ went on to consider whether Reeves retained the RFC to perform her past work or any other work in significant numbers in the national economy. In so doing, the ALJ first noted that Reeves testified that she had to lie down 5 or 6 times per day for a duration of at least 30 minutes each time, but that she also testified that she swept the kitchen, did some cooking, did the dishes and laundry, shopped, and occasionally went to church or ate out at restaurants. The ALJ noted "how all this would be impossible if she truly were flat on her back as much as is claimed." The ALJ further indicated that Reeves failed to mention her daily pain,

9

which was all over her body, until she was repeatedly prompted by the ALJ. The ALJ thus concluded that Reeves's testimony was not credible or consistent with the medical evidence. The ALJ additionally noted that Reeves's psychiatrist indicated that her depression was due to her fibromyalgia, but that her other physicians found "an intentional tremor" and no physical limitations despite her complaints.

Next, the ALJ found that the non-examining physicians determined that Reeves could perform medium work. In light of Reeves's testimony that she could do housework, Dr. Greenberg's and Dr. Hernandez's findings that Reeves had no physical limitations, and the non-examining physicians' findings, the ALJ adopted the non-examining physicians' assessment that Reeves could perform medium work. The ALJ indicated that Reeves's RFC and limitations were: (1) occasional climbing, but never on ladders, ropes, or scaffolds (based upon Dr. Greenberg's examination and modified by Reeves testimony on fatigue and dizziness); (2) must wear corrective lenses for vision; (3) should not work around unprotected heights or dangerous machines (based upon her testimony on dizziness); (4) mild to moderate pain; and (5) best suited for simple work without prolonged interpersonal contact (based upon evidence of moderate depression). The ALJ determined that Reeves's past work as a laundry worker, defined as unskilled, medium level work, did not require the performance of work-related activities precluded by her RFC.

The ALJ noted that the VE's testimony supported that conclusion and that Reeves's counsel's questions to the VE involved the assumption of limitations that were unproven and not persuasive in light of Reeves's exaggeration of her impairments. Thus, the ALJ determined that Reeves was not under a "disability" as defined in the Social Security Act, and, as such, was not entitled to DIB or SSI. The appeals council denied review. The district court affirmed the decision of the Commissioner of the SSA ("Commissioner").

## II. Discussion

We review a social security case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). The Commissioner's decision will not be disturbed "if, in light of the record as a whole, it appears to be supported by substantial evidence," which is "more than a scintilla and is such relevant evidence as a reasonable person would accept to support a conclusion." Id. at 1439-40.

A claimant applying for disability benefits must prove that she is disabled. 20 C.F.R. § 404.1512; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones v.

Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).  First, the claimant must show that she has not engaged in substantial gainful activity.  Jones, 190 F.3d at 1228.  Second, she must prove that she has a severe impairment or combination of impairments.  In step three, if her impairment meets or equals a listed impairment, she is automatically found disabled.  If it does not, she must move on to step four, where she must prove that she is unable to perform her past relevant work.  Finally, if the claimant cannot perform past relevant work, then the burden shifts to the Commissioner in the fifth step to show that there is other work available in significant numbers in the national economy that the claimant is able to perform.  Id.

**(A)  ALJ's Evaluation of the Medical Evidence**

Reeves argues on appeal that the ALJ failed to evaluate adequately the medical evidence of record and to articulate the weight he gave to Dr. Azar's, Dr. Greenberg's, and Dr. Hernandez's opinions.  Reeves also maintains that the ALJ incorrectly found that the physicians had observed no physical impairments because the evidence actually showed that the physicians all found that Reeves suffered from a resting tremor that improved with intention, and that the ALJ merely misinterpreted that finding to mean that Reeves was faking or exaggerating her tremor.  She asserts that the ALJ also failed to address her gait instability.

12

According to the SSA's regulations, it generally "give[s] more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(d)(2). Indeed, the ALJ "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.1986). With regard to specialists, the SSA "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). Additionally, an ALJ "must consider findings of [non-examining] State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled." 20 C.F.R. § 404.1527(f)(2)(i).

Review of the record indicates that Dr. Azar found that Reeves had a mood disorder that was secondary to her medical illness, and that, while Reeves had been a hard worker, she could not continue her work "after she started experiencing debilitating physical symptoms which caused her depression." In his decision, the ALJ accurately detailed Dr. Azar's medical opinions, but also noted that Dr. Azar

13

had not treated Reeves's alleged physical impairments. The ALJ went on to find that Reeves suffered from mild to moderate mental impairments and depression, and also included Reeves's mental limitations in its explanation of her RFC. Accordingly, the ALJ did not reject Dr. Azar's opinion with regard to Reeves's mental limitations, but rather did not accept Dr. Azar's opinion that her mental impairments were caused by her debilitating physical illness. In so doing, the ALJ noted that: (1) Dr. Azar was Reeves's psychiatrist and did not treat her physical impairments; (2) the physical impairments, as identified by Reeves's physicians who treated her physical ailments, did not lead to a finding that Reeves was disabled; and (3) the physicians who treated Reeves's physical impairments determined that some of her physical problems may have been a result of her mental impairments. Therefore, despite Reeves's argument to the contrary, the ALJ gave weight to Dr. Azar's opinion to the extent that it commented on Reeves's mental condition, but the ALJ rejected that opinion, with supporting reasons, to the extent that it made findings as to Reeves's physical impairments.

Reeves secondly contends that the ALJ did not explain the weight, if any, it gave to Dr. Greenberg's and Dr. Hernandez's opinions, nor did the ALJ correctly interpret Dr. Greenberg's findings. Despite Reeves's assertion, the record does not establish that the ALJ did not consider those doctors' opinions or indicate the

14

weight it afforded them. As to Dr. Greenberg's opinion, the ALJ noted that Dr. Greenberg found that Reeves had a resting tremor, suffered from no physical impairments or neurologic abnormality, and that she was disabled from her psychiatric symptoms. A review of Dr. Greenberg's medical evidence in the record confirms the ALJ's interpretation of Dr. Greenberg's opinion. The ALJ further noted that Dr. Hernandez's opinion was similar to Dr. Greenberg's, a finding that the record again supports. Thus, the ALJ did not misinterpret the opinions of either Dr. Greenberg or Dr. Hernandez.

Moreover, review of the ALJ's decision indicates that he gave full weight to Dr. Greenberg's and Dr. Hernandez's opinions. While the ALJ did not explicitly indicate how he weighed those opinions, he did indicate that he accepted them as true facts. Additionally, the ALJ considered the opinions of the non-examining state agency medical consultants, specifically, that Reeves could perform medium-level work, in conjunction with "the fact that both [Dr. Greenberg] and [Dr. Hernandez] found no physical limits." Therefore, the ALJ did not reject or fail to afford proper weight to the opinions of Reeves's treating physicians, as those opinions related to Reeves's physical impairments. The issue that Reeves raises on appeal is that the ALJ did not consider those physicians' opinions as they related to her mental impairments. To the extent that the ALJ disregarded Drs. Greenberg

15

and Hernandez's opinion that Reeves's physical impairments were a result of her mental impairments, that determination was harmless because, as established above, the ALJ already had given weight to Dr. Azar's psychiatric assessment in determining that Reeves's psychiatric impairments did not amount to a disability. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983) (ALJ's mischaracterization of claimant's past work was harmless error because such characterization of vocational factors was irrelevant where the ALJ found no severe impairment).

Lastly, Reeves argues that the ALJ failed to address her gait instability. Review of the ALJ's decision reveals that Reeves correctly asserts that the ALJ failed to address explicitly the evidence of her gait instability. In light of the record as a whole, however, the ALJ's omission in this regard is harmless because the medical evidence is inconsistent concerning Reeves's gait impairment. See Diorio, 721 F.2d at 728. While Reeves regularly complained of gait instability, several of her physicians found her gait to be normal. For instance, Dr. Azar reported that Reeves's gait showed improvement, and Dr. Greenberg's examination revealed Reeves had a normal gait. Furthermore, the reports of the non-examining state agency physician indicated that Reeves could stand or walk with normal breaks for approximately six hours in an eight-hour work day.

16

**(B) Reeves's Complaints of Pain and Fatigue**

Reeves also argues on appeal that the ALJ erred in disregarding her testimony of her pain, fatigue, and weakness. She contends that the ALJ's finding that she was able to perform work at a medium level, and the ALJ's adoption of the non-examining state agency physician's opinion, was in direct contrast to her testimony.

We have established a three-part test that applies when a claimant attempts to demonstrate disability through her own testimony of pain or other subjective symptoms. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). The test requires that the claimant establish:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Id. "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." Id. (citation omitted).

A careful review of the record reveals that the ALJ articulated reasons for discrediting Reeves's testimony, which reasons are supported by the administrative

hearing transcript. See Holt, 921 F.2d at 1223. The question now becomes whether the ALJ's reasons were adequate in light of the three-part test. See Holt, 921 F.2d at 1223. As to the first part of the test, the record indicates that Reeves suffered from the underlying medical conditions of fibromyalgia, anxiety, and depression. However, the record does not support a finding that there was objective medical evidence that confirmed the severity of Reeves's pain or fatigue. According to the medical evidence, Reeves complained of her fatigue, and occasionally her pain, but none of her physicians ever diagnosed her with a medical condition that supported those symptoms nor did they ever prescribe her medication for pain. As such, Reeves did not meet the three-part test required by Holt. Thus, the ALJ did not err in discrediting Reeves's subjective testimony regarding her pain, fatigue, and other symptoms.

## III. Conclusion

In light of the foregoing, we conclude that substantial evidence supports the ALJ's finding that Reeves was not disabled. Thus, the district court's affirmance of the Commissioner's denial of DIB and SSI payments is

**AFFIRMED.**

18